778 F.2d 963
 19 Fed. R. Evid. Serv. 256
 UNITED STATES of America
v.
DE PERI, Joseph.
Appeal of Joseph DE PERI.
UNITED STATES of America
v.
MARTIN, James.
Appeal of James MARTIN.
UNITED STATES of America
v.
LINSO, Dennis.
Appeal of Dennis LINSO.
UNITED STATES of America
v.
MORRELL, George.
Appeal of George MORRELL.
UNITED STATES of America
v.
PECIC, Henry.
Appeal of Henry PECIC.
UNITED STATES of America
v.
MURPHY, Theodore.
Appeal of Theodore MURPHY.
UNITED STATES of America
v.
KATZ, George.
Appeal of George KATZ.
 Nos. 84-1566, 84-1571, 84-1577 to 84-1579, 84-1594 and 84-1599.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 15, 1985.
Decided Dec. 6, 1985.
As Amended Dec. 13, 1985.
Rehearing and Rehearing In Banc in Nos. 84-1571, 84-1594,
and 84-1599 Denied Jan. 9, 1986.
 
 Susan I. Schulman (Argued), Spencer M. Wertheimer, Philadelphia, Pa., for appellant, Theodore Murphy.
 Timothy J. Savage (Argued), Timothy J. Savage, P.C., Philadelphia, Pa., for appellant, George Katz.
 Howard B. Klein (Argued), Asst. U.S. Atty., Chief, Corruption Section, Ronald H. Levine (Argued), Asst. U.S. Atty., Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Philadelphia, Pa., for appellee.
 Malcolm L. Lazin (Argued), Shaun R. Eisenhauer, Rubin, Quinn and Moss, Philadelphia, Pa., for appellant, Joseph DePeri.
 Joseph Fioravante (Argued), William J. Winning, Curran, Winning & Fioravanti, Media, Pa., for appellant, James Martin.
 Nino V. Tinari, Nino V. Tinari, P.C., Philadelphia, Pa., for appellant, Dennis Linso.
 Joel Harvey Slomsky (Argued), DiGiacomo & Slomsky, Philadelphia, Pa., for appellant, George Morrell.
 Joseph N. Bongiovanni, III (Argued), Bongiovanni & Berger, Philadelphia, Pa., for appellant, Henry Pecic.
 Before ADAMS, HUNTER, Circuit Judges, and STERN,* District Judge.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge.
 
 
 1
 This case arises from a tragic chapter in the history of the Philadelphia Police Department dealing with conspiracy to extort protection money from video poker machine gambling operations and "numbers writers." In the spring of 1984, the grand jury investigating these activities issued an eighty-six count indictment against fifteen police officers, including a Deputy Commissioner and a Chief Inspector. For management purposes, the District Court for the Eastern District of Pennsylvania ordered the severance of the defendants into two groups. Trial in this case dealing with the first group commenced on July 9, 1984.[1] On August 10, 1984, the jury returned a guilty verdict against the defendants on all submitted counts.[2] The trial court sentenced the defendants to prison terms of varying length. Deputy Commissioner Martin received eighteen years; Chief Inspector DePeri, fifteen years; Pecic, twelve years; Murphy, ten years; eight each for Linso and Katz; and Morrell received three. Defendants appeal their convictions and sentences for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sec. 1962(d) (1982), the Hobbs Act, 18 U.S.C. Sec. 1951 (1982), and obstruction of justice, 18 U.S.C. Secs. 1503, 1510 (1982). For the reasons discussed below, we affirm.
 
 I.
 A. The Indictment and Trial
 
 2
 On May 3, 1984, a federal grand jury returned a multiple count indictment against fifteen officers and former officers of the Philadelphia Police Department charging participation in a conspiracy to extort and extortion of protection money from video poker machine and illegal numbers lotteries operators. Count One of the indictment charged each defendant with conspiracy, racketeering, and extortion. Count Two charged each defendant with a substantive RICO violation. Counts Three, Four, and Five charged Police Department Deputy Commissioner James Martin with obstructing a criminal investigation by paying hush money to Northwest Division Vice Unit Officer Albert Ricci. Counts Six and Seven charged Martin and Joseph DePeri, a Police Department Chief Inspector, with obstructing justice by ordering the destruction of records concerning the extorted payments. Counts Eight through Eighty-six charged the defendants with Hobbs Act extortion.
 
 
 3
 At trial, the evidence centered on the defendants' activities in the Northwest Division from late 1979 to April 1984. The government's case included the testimony of Albert Ricci, former Northwest Division Vice Lieutenant Joseph Alvaro, and the victims of the extortion scheme. Alvaro, who reported directly to DePeri while the latter served as the Northwest Division's Inspector, was the government's key witness. Alvaro's testimony detailed how the extortion money was passed up the ranks from the bagmen to the Northwest Division's Inspector. In addition to Ricci's and Alvaro's testimony, the government introduced tape recordings of face-to-face and telephone conversations, primarily between Alvaro and Martin, DePeri, and Ricci.
 
 B. The Appellants
 
 4
 The Philadelphia Police Department is organized into geographic divisions, with each division composed of approximately two districts. Each division also contains a vice unit charged with investigating violations of the city's and Pennsylvania's vice laws, including illicit gambling. Until 1980, Harry Pecic was the vice lieutenant in the Northwest Division. In late 1979, the evidence shows that Pecic began to extort protection payments from numbers writers and video poker machine operators. After he was transferred to another division, Pecic met with Alvaro at Inspector DePeri's request and provided Alvaro with the list of protected numbers and poker machine establishments located in the Northwest Division. DePeri also told Alvaro to use the code name "Whitey" to identify himself to the operators when he collected the money.
 
 
 5
 Joseph DePeri was appointed Inspector of the Northwest Division in December, 1980. DePeri selected Joseph Alvaro as his vice lieutenant to replace Pecic after DePeri's first choice for vice lieutenant, defendant George Katz, was rejected by the Police Commissioner. Alvaro testified that DePeri discussed collecting the protection money with him, and instructed Alvaro to build up the collection list and to pick one of the members of his vice squad as the bagman.
 
 
 6
 Alvaro chose Albert Ricci to be the bagman. With the list of protected locations provided by Pecic, Ricci collected payments from old clients and expanded the scheme by adding new ones, primarily video machine vendors, to the list. The evidence shows that Ricci increased business by seizing unprotected poker machines and transporting them to Northwest Division Headquarters. Ricci would then hook the vendors into the scheme by offering to sell the machines back to them with the understanding they could continue to use the machines for gambling if Ricci received a monthly stipend of fifty to one hundred dollars per machine. Ricci would collect the payments twice a month and would pass the payments to Alvaro, who in turn passed approximately two-thirds of the money to DePeri. Alvaro managed the extortion scheme, comparing notes with Ricci to ensure that all the victims had paid up before Alvaro delivered the money to DePeri. Eventually, the protection scheme expanded to the point where Ricci's share of the collection increased from three hundred to fifteen hundred dollars per month, out of a gross of six thousand dollars per month.
 
 
 7
 George Katz, DePeri's first choice for Alvaro's slot, remained a lieutenant in the North Division. Alvaro testified that DePeri instructed him to allow Katz to collect some protection payments in the Northwest Division "to give George Katz an opportunity to make a few dollars for himself."
 
 
 8
 The Northwest Division contains two districts, the Fifth and the Thirty-ninth. Captain Dennis Linso commanded the Northwest Division's Fifth Division where Officer George Morrell worked as a patrolman. Alvaro and Ricci testified that Linso also extorted protection payments, employing Morrell as his bagman.
 
 
 9
 Lieutenant Theodore Murphy commanded the Southwest Division's vice unit. Alvaro testified that Murphy had called him to inquire as to whether Alvaro received protection money from a certain vendor. Donald Devore, a video game vendor, testified that he paid protection money directly to Murphy. William Dawley, also a video game vendor with machines in the Southwest Division, testified that he paid protection money to Central Division Inspector John DeBenedetto, an unindicted coconspirator. This money was later transferred to the Southwest Division. Dawley also testified that he had met with Murphy on one occasion to verify the locations of Dawley's video poker machines.
 
 
 10
 James Martin entered the conspiracy when he served as Night Command Inspector, working in the office across the hall from Inspector DePeri. Martin began collecting protection money from Lester Barry, a numbers writer, in early 1982. When DePeri was appointed Chief Inspector in June 1982, Martin was promoted to Northwest Division Inspector. Despite this change in personnel, the extortion scheme proceeded uninterrupted: Ricci continued to pass the money to Alvaro, who then gave it to Martin. After Alvaro was promoted to Captain in the Police Radio Division in July 1982, Ricci testified that he delivered the payments directly to Martin. Martin remained at the Northwest Division until November 1983, when he was appointed Deputy Commissioner.
 
 C. The Investigation and Attempted Cover-up
 
 11
 In November 1982, a federal grand jury served subpoenas for the contents of certain Central Division officers' desks, including Inspector DeBenedetto's.[3] Learning of this, Chief Inspector DePeri called Captain Alvaro at Police Radio, and instructed him to destroy the two copies of the poker machine payoff list kept at Northwest Division Headquarters. Alvaro returned to the headquarters, broke into Martin's desk, and retrieved Martin's poker machine payoff list. Alvaro also searched Ricci's desk and found Ricci's copy of the payoff list along with some of the extorted funds. After returning the money to Ricci, Alvaro went home and burned both payoff lists.
 
 
 12
 Once Alvaro began cooperating with the federal investigation, he recorded conversations with DePeri and Martin concerning the destruction of the lists. During a conversation with Martin, Alvaro expressed his concern that the grand jury would infer that he had retrieved and destroyed the payoff papers in Martin's desk. In response, Martin indicated his willingness to testify before the grand jury that he had ordered Alvaro to break into his desk to retrieve his own papers. In another conversation, after observing that Ricci had been indicted by the grand jury, Martin told Alvaro that he would be able to raise the money to cover Ricci's back taxes and legal expenses to repay Ricci for "going to bat" for him.
 
 
 13
 According to the government, the investigation produced evidence of a city-wide conspiracy, unbounded by any particular police division. Although the defendants in this consolidated appeal were all connected to the scheme through the Northwest Division, the government took the position at trial that the evidence established that protection money was passed vertically within the Northwest Division and laterally between divisions.
 
 II.
 
 14
 Appellants raise a plethora of issues in this appeal, most of which deal with the discretionary authority of the trial court in ruling on evidentiary matters. Many of these issues affect all of the defendants, but most affect only a few and some are raised by only one of the seven. Most of the issues involve the straight-forward application of settled legal principles. Consequently, we will abbreviate much of our discussion. We believe that the most serious issue in this appeal concerns the introduction of coconspirators' statements against some of the appellants, particularly those statements contained in the taped conversations between Alvaro and Martin and Alvaro and DePeri. Although there is a great deal of overlap in many of the issues raised, we will discuss the questions raised by each appellant in the order in which they are listed in this appeal.
 
 A. Claims Initially Raised by DePeri
 
 15
 Pre-trial Publicity and the Denial of the Jury Sequestration Motion
 
 
 16
 DePeri, Pecic, and Murphy argue that the extensive pre-trial publicity surrounding the scandal biased the jury and deprived them of a fair trial. In particular, appellants complain that a series of articles that appeared in The Philadelphia Inquirer's Sunday magazine supplement entitled "Cops on the Take," describing a related extortion scheme irrevocably tainted the trial. Appellants claim that because jury selection convened on July 9, 1984, one day after the second installment in the Inquirer series appeared, and because the majority of the prospective jurors questioned by the court admitted some knowledge of related extortion schemes, appellants were deprived of their right to a fair trial.
 
 
 17
 The district court's voir dire spanned four days, during which the court individually examined eighty-one jurors on the extent of their exposure to the case and the degree to which they had formed an opinion concerning the officers' conduct. Although seven of the jurors who deliberated and returned the guilty verdicts admitted that they had been exposed to the publicity surrounding the case, and two admitted to familiarity with the Inquirer series, we believe that the trial court's exhaustive voir dire ensured that appellants were not deprived of their sixth amendment right to a fair trial decided by "a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).
 
 
 18
 Voir dire is conducted under the supervision of the trial court and is left to its sound discretion. See Ristaino v. Ross, 424 U.S. 589, 594, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976). In a case involving extensive and allegedly inflammatory pre-trial publicity, we will find that the trial court abused its discretion only when appellants demonstrate clearly that the jurors possessed "such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984), citing Irvin, 366 U.S. at 723, 81 S.Ct. at 1643. It is the rare case in which adverse pretrial publicity will create a presumption of prejudice that overrides the jurors' assurance that they can be impartial. See United States v. Provenzano, 620 F.2d 985, 995 (3d Cir.), cert. denied, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980). The mere fact that community members are cognizant of the crimes and of the defendants' identities does not, by itself, render the trial constitutionally unfair. See Dobbert v. Florida, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977). Instead, we must examine the totality of the circumstances surrounding the trial for the conjunction of extensive and inflammatory publicity immediately prior to trial, evidence of the community's outrage at the revelation of the crimes, and clear indications of juror partiality on the record, before we can reverse the trial court's finding of jury impartiality for manifest error. See Yount, 104 S.Ct. at 2889-90; Irvin, 366 U.S. at 723, 728, 81 S.Ct. at 1645. Cf. Murphy v. Florida, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975).
 
 
 19
 Our review of the circumstances surrounding the trial leads us to conclude that the court did not abuse its discretion. Although the pre-trial publicity was extensive, and there was no "cooling off" period between the publicity and trial as in Yount, we find a lack of inflammatory, sensational journalism that would lead us to question the jury's impartiality. Moreover, the Inquirer articles only indirectly concerned appellants. Only one defendant, Martin, is mentioned, and then only in passing. The articles detail a structurally similar but apparently separate extortion scheme conducted in the Central Division by Inspector DeBenedetto. Nor do we discern an overpowering sense of outrage in the community or evidence of juror partiality in the record. Appellants fail to bring to our attention any portion of the voir dire that indicates that any juror had made up his mind with regard to the merits of the government's case. Further, we note that ten jurors were seated without challenge by appellants. As to these ten, whether or not exposed to the pre-trial publicity, failure to challenge generally waives defendants' objections on appeal. See Provenzano, 620 F.2d at 996 n. 15. Concerning the two jurors who were seated over defendants' challenges, our review of the record shows that the trial court's careful voir dire established that at most, the jurors were aware of the scandal, but could not recall more than the fact that "there were some policemen indicted for racketeering." The court properly determined that these jurors had not made up their minds as to the guilt or innocence of any of the defendants and that they would be impartial.
 
 
 20
 This is the second time we have had the opportunity to review the voir dire proceedings in this case, and we reaffirm our approval of the trial court's conduct. In United States v. Martin, 746 F.2d 964, 973 (3d Cir.1984), we commended the trial court's "patient and careful examination of potential jurors ... [as] an excellent example of the power of voir dire to screen out persons who may not be impartial." The record shows the district court's acute sensitivity to the problems generated by the public profile of this case. That the jurors were familiar with the broadest details of the scheme was inevitable from the publicity surrounding the trial; that the jurors ultimately impanelled provided defendants with a fair trial is due entirely to the skill of the trial judge in conducting a searching and effective voir dire.
 
 
 21
 Pecic argues that the district court abused its discretion in denying his motion to sequester the jury during the trial and during its deliberations. The decision whether to sequester the jury lies wholly within the discretion of the district court. As the district court observed when it denied defendants' post-trial motions, "sequestration is an extreme measure, 'one of the most burdensome tools of the many available to assure a fair trial.' " quoting United States v. Porcaro, 648 F.2d 753, 755 (1st Cir.1981). In light of the trial court's instructions to refrain from reading, viewing television, or listening to the radio reports about the case, the court's daily examination of the jurors to determine if they were following this instruction, and the circumstances and the length of the trial, we find no abuse.
 
 
 22
 Exclusion of Evidence Concerning DePeri's Attitude Towards Children
 
 
 23
 Alvaro testified to attending a meeting between Inspector DePeri and poker machine vendor Joseph Lamarra in which DePeri told LaMarra "that if anybody ever squealed on him, he would kill his f-----g kids." In an attempt to rebut this testimony, DePeri tried to introduce testimony that he had suffered a severe trauma when a school bus killed his child more than ten years ago. According to DePeri, the effects of this trauma made it unlikely that DePeri would threaten the life of any child. This testimony would also show that "children were very dear to DePeri and that he took a special interest in the children of the people under his command" and that DePeri had organized charitable collections for children. DePeri argued that this evidence would undercut Alvaro's testimony by showing that it was inconsistent with DePeri's high regard for the welfare of children. The court declined to accept this argument, however, and excluded the evidence under Federal Rules of Evidence 401 and 403 as irrelevant and prejudicial.
 
 
 24
 We believe that the district court did not abuse its discretion in excluding this evidence. DePeri's state of mind regarding children in general does not make his statement to LaMarra "more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Moreover, the evidence appears to be an effort to evoke the jury's sympathy toward DePeri by introducing an account of DePeri's misfortunes. We hold therefore that the court properly found DePeri's proffer of evidence irrelevant and prejudicial.
 
 
 25
 Introduction into Evidence of Officer Molloy's Testimony
 
 
 26
 Lawrence Molloy was a Philadelphia police officer formerly assigned to the Central Division. Molloy was indicted in 1983 and subsequently convicted on charges of accepting illegal protection payoffs. At appellants' trial, Molloy testified concerning the collection and distribution of protection payments from numbers writers and video poker machine vendors in the Central Division. In the course of his testimony, Molloy indicated that he presently resided at a halfway house in Camden, New Jersey, and had been convicted for extortion. Molloy also testified that he did not know any of the appellants.
 
 
 27
 DePeri and Martin argue that the court erred in admitting Molloy's testimony. They contend that Molloy's testimony was irrelevant because it did not concern the extortion scheme in the Northwest Division and that the court should have excluded the testimony as prejudicial under Federal Rule of Evidence 403 because of Molloy's conviction on charges similar to the charges brought against appellants. We will reverse the district court's decision to admit Molloy's testimony only if appellants demonstrate that the ruling was "arbitrary or irrational." United States v. Friedland, 660 F.2d 919, 929 (3d Cir.1981), cert. denied, 456 U.S. 989, 102 S.Ct. 2268, 73 L.Ed.2d 1283 (1982). Our review of the record leads us to conclude that the court's decision was neither arbitrary nor irrational. Molloy's testimony was probative of the defendants' alleged use of the Philadelphia Police Department as a vehicle to collect and distribute the protection payments. Molloy testified that he received payoffs from vendors who had poker machines "all over the city," and, more importantly, collected payments for machines that were not located in the Central Division. This money was funneled directly to Inspector DeBenedetto of the Central Division. Alvaro later testified that he contacted DeBenedetto to receive payoffs collected by DeBenedetto's men from vendors with machines located in the Northwest Division. This evidence revealed that the defendants' extortion activities were not limited to the Northwest Division, and that the defendants used the services of other divisions to help collect protection money, as the indictment charged.
 
 Improper Prosecutorial Comments
 
 28
 DePeri, Pecic, and Murphy assert that the government prejudiced their trial by informing the jury that its witnesses had passed polygraph examinations. This statement allegedly occurred during the following exchange between the government and Captain Linso:
 
 
 29
 Q. Is it your testimony that [certain poker machine vendors] did not pay you or any representative of you for any poker machines?
 
 
 30
 A. That is exactly my testimony and they didn't take a lie detector test either like I wanted to do.
 
 
 31
 The Government: Your Honor, I would ask that that be striken.
 
 
 32
 Mr. Tinari: Objection.
 
 
 33
 The Court: Sustained.
 
 
 34
 The Government: It's also untrue.
 
 
 35
 Mr. Tinari: That is objected to. I move for a mistrial.
 
 
 36
 The Court: Denied. The jury will disregard Mr. Klein's comment and the jury will disregard this witness's answer to which I have sustained an objection and give no consideration to these matters in any way. Shall we continue?
 
 
 37
 According to appellants, the prosecutor's remark that Linso's statement was "also untrue" constituted impermissible vouching for the credibility of its witnesses, the poker machine vendors. While we agree that the government's statement was improper, we hold that even if the statement constituted error, the error is harmless and did not require the court to grant the mistrial motion. See United States v. Hasting, 461 U.S. 499, 509, 103 S.Ct. 1974, 1980-81, 76 L.Ed.2d 96 (1983). Under United States v. DiPasquale, 740 F.2d 1282, 1296-97 (3d Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985), we must examine the record as a whole to ascertain whether the error prejudiced defendant's trial, such that within the setting of the trial, the error was "so insignificant and unimportant" that it may be deemed harmless. See Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). The record shows that this comment is ambiguous. The government did not state that its witnesses had taken polygraph exams, it stated only that Linso's statement was "untrue," which could have also meant that Linso did not take a lie detector test. The record also shows that the government's remark was isolated, that the prejudice, if any, to the defendants was minimal, especially in light of the court's prompt corrective instruction, and that the evidence against appellants was strong.
 
 Variance Allegations
 
 38
 DePeri, Linso, Pecic, and Katz maintain that the indictment impermissibly varied from the proof at trial. Appellants contend that while the indictment charged a single conspiracy, the proof supported only a finding of "ad hoc associations of various officers." Essentially, they argue that the government failed to show their association to each other within the RICO enterprise charged, the Philadelphia Police Department, in sufficient detail to permit their conviction.
 
 
 39
 The burden on the government under RICO was to show that the defendants knowingly agreed to participate in the RICO conspiracy. See United States v. Jannotti, 729 F.2d 213, 226 (3d Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984). In Jannotti, we observed that
 
 
 40
 'The mere fact that a defendant works for a legitimate enterprise and commits racketeering acts while on the business premises does not establish that the affairs of the enterprise have been conducted "through" a pattern of racketeering activity'.... Instead, the government must show that a person 'is enabled to commit the predicate offenses solely by virtue of his position in the enterprise; or ... the predicate offenses are related to the activities of that enterprise.'
 
 
 41
 Id. (citations deleted). The evidence at trial established that the defendants' positions in the Philadelphia Police Department enabled them to collect and distribute protection profits, contact and involve new clients in the racket, and enforce the extortion scheme. The evidence presented to the jury would have allowed it to conclude that the defendants "knowingly agreed to participate in the 'enterprise' through a pattern of racketeering." United States v. Riccobene, 709 F.2d 214, 221 (3d Cir.), cert. denied, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983).
 
 
 42
 In reviewing the jury's finding that the defendants were involved in a single enterprise, we must determine if there is sufficient evidence, viewed in the light most favorable to the government, to support its finding. See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Fischbach & Moore, Inc., 750 F.2d 1183, 1189 (3d Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985); United States v. Leon, 739 F.2d 885, 890-91 (3d Cir.1984); United States v. Provenzano, 620 F.2d 985, 999 (3d Cir.), cert. denied, 449 U.S. 889, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980). A review of the record compels us to hold that the evidence sufficed to link these defendants to the conspiracy and establish RICO liability. In United States v. Maker, 751 F.2d 614, 625 (3d Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985), we observed that a single scheme is demonstrated when "the evidence shows a common goal, operations carried out in virtually identical manner, and an overlapping of defendants." All three factors are present in this case. The common goal was the extortion of poker machine vendors and numbers parlors; the method of extortion in all cases was similar--the machines would be seized and sold back to the operators for the same price, the protection money ranged between fifty and one hundred dollars per machine in all areas, the victims payed on the first or fifteenth of the month, there was a common code name ("Whitey") that was passed on to the bagmen, the money was collected and passed "up the ladder" to the Inspectors (Central Division Inspector John DeBenedetto, Northwest Division Inspectors DePeri and Martin); and the defendants, although stationed in different divisions, came into contact with one another in the course of dividing the profits from and enforcing the protection scheme.
 
 
 43
 DePeri, Murphy, and Katz claim they could not have participated in a single conspiracy because they did not know the identities of all of the other participants nor were they aware of the overarching conspiracy. This knowledge is not essential to the finding of a RICO conspiracy. As we said in Riccobene, "[i]t is well established that one conspirator need not know the identities of all his coconspirators, nor be aware of all the details of the conspiracy in order to be found to have agreed to participate in it." 709 F.2d at 225. The government proved that the defendants understood the essential nature of the plan and knowingly agreed to participate in the plan, which is sufficient for RICO liability. See id.
 
 Open Court Statement by a News Reporter
 
 44
 DePeri, Pecic, and Murphy argue that the statement by a Philadelphia Inquirer reporter in the courtroom before the jury concerning the poor sound quality of tape recorded conversations played before the court prejudiced their trial by alerting the jury to the high profile of the case. While the court listened to Alvaro and Ricci discuss the latter's job prospects after his extortion indictment, the following exchange took place:
 
 
 45
 The Court: Can the sound be turned up at this point for the audience?Mr. Weiner: My name is Tim Weiner. I work for the Philadelphia inquirer.
 
 
 46
 Mr. Lazin: Is this something that is appropriate to be heard in front of the jury? I have an idea what he is going to say.
 
 
 47
 The Court: I think what he is going to say [sic], we will let the jury stay in the courtroom.
 
 
 48
 Mr. Weiner: For the purposes of the record, one of the two speakers, the one on the right, is in open pain, and the sound and signals emanating from the one on the left is unintelligible, utterly unintelligible, to the audience and members of the press and the public without the aid of the transcript. For the purposes of the record, we would respectfully ask after the playing of the tape is completed, that your Honor delay further playing of the tapes until counsel may be heard on this matter. We are here as the eyes and ears of the public on a matter of great public importance and we cannot function under these conditions. Thank you.
 
 
 49
 The court directed a technician to resolve on the problem and ruled that the press could read copies of the tape transcripts during lunch recesses. The court then excused the jury, and a number of other reporters registered complaints with the court, e.g., that they were not able to make copies of the transcripts or the tapes. The defendants moved for mistrial, again out of hearing of the jury, on the ground that the jury's verdict would be influenced by their knowledge of the trial's public interest. The court denied the motions. When the jury returned, the court gave a corrective instruction admonishing them to ignore to the reporter's remarks.
 
 
 50
 This third party communication with the jury would be considered objectionable and provide sufficient grounds to overturn the verdict if it can be shown that it violated the sixth amendment's guarantees, e.g., if the statement somehow calls the jury's impartiality into question, or deprives the defendant of his rights of confrontation and counsel. See Government of Virgin Islands v. Gereau, 523 F.2d 140, 150-51 (3d Cir.1975), cert. denied, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976).
 
 
 51
 In this context, the reporter's statement neither biased the jury against the defendants nor did it provide the jury with novel information concerning the public's interest in the trial. Given the lack of prejudice and the court's prompt corrective instruction, we find no error.
 
 Agent Gamber's Reports
 
 52
 DePeri argues that the court erred by refusing to allow him to introduce into evidence reports completed by Federal Bureau of Investigation Agent Gamber detailing his interviews with video poker machine vendors LaMarra and Cook. DePeri claims that these reports contained statements by LaMarra and Cook that would have impeached part of Alvaro's testimony and argues that the court should have admitted the interviews under the business records exception to the hearsay rule.
 
 
 53
 We disagree. The applicable rule here is Federal Rule of Evidence 803(8), the public records exception to the hearsay rule. Although this rule generally permits the introduction of public records into evidence by either party in a civil proceeding, subdivision (B) prevents the introduction of law enforcement reports against defendants in criminal cases. See United States v. Grady, 544 F.2d 598, 604 (2d Cir.1976). Unlike subdivision (C) dealing with factual findings resulting from official, non-law enforcement investigations, subdivision (B) does not provide explicitly for the introduction of police reports into evidence against the government. In United States v. Smith, 521 F.2d 957 (D.C.Cir.1975), the court reasoned that subdivision (B) "should be read in accordance with the obvious intent of Congress and in harmony with 803(8)(C) to authorize the admission of the reports of police officers and other law enforcement personnel at the request of the defendant in a criminal case." 521 F.2d at 968 n. 24. Even under this reading of subdivision (B), the court correctly denied DePeri's request. This is a classic "hearsay within hearsay" problem. While Rule 803(8)(B) would permit DePeri's introduction of the reports themselves, which would ordinarily be considered hearsay, LaMarra's and Cook's out-of-court statements contained in the records require a separate hearsay exception before they can be admitted. Because DePeri did not provide the court with an applicable hearsay exception to allow the introduction of LaMarra's and Cook's statements, we hold that the court did not err in refusing to admit Agent Gamber's reports.
 
 B. Claims Initially Raised by Martin
 
 54
 Admission of Tape Recorded Conversation between Ricci and Alvaro
 
 
 55
 At trial, Albert Ricci testified to handing an envelope containing ten thousand dollars in protection money directly to James Martin. On re-direct examination, to rebut defense counsel's implied charge that Ricci constructed this story as a bargaining chip when Ricci sought immunity from prosecution, the government played a tape recorded conversation between Ricci and Alvaro where Ricci states that he passed the money to Martin. The court admitted the statement under Federal Rule of Evidence 801(d)(1)(B), which excludes from the definition of hearsay prior statements where "[t]he declarant testifies at the trial ... and the statement is ... consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication." When Alvaro made the tape, Ricci was unaware of the fact that this conversation was being recorded, and had not yet decided to inform the United States Attorney about his involvement in the protection scheme. On appeal, Martin suggests that because Ricci knew that he was a target of the grand jury investigation, Ricci had a motive to falsify his story to Alvaro, and consequently, the court erred in admitting Ricci's prior consistent statement.
 
 
 56
 The timing of consistent prior statements divides the courts of appeals. Compare United States v. Quinto, 582 F.2d 224, 234 (2d Cir.1978) (reversing conviction when prior consistent statement made after the motive to falsify arose) with United States v. Parodi, 703 F.2d 768, 784-85 (4th Cir.1983) (prior existence of motive to fabricate does not render the prior consistent statement inadmissible). We find it unnecessary to enter this debate here, as Martin fails to support his assertion with any evidence. The record, fairly read, indicates that Ricci addressed Alvaro as his former commanding officer, a coconspirator, and had no idea that the conversation would be of any value to him in the future. That Ricci's recorded statements are inculpatory, not exculpatory, evidences a lack of guile that supports the interpretation that the conversation occurred before Ricci decided to talk to the prosecutors. See United States v. Rohrer, 708 F.2d 429, 433 (9th Cir.1983). In sum, we cannot discern a motive to falsify arising prior to the conversation, and therefore find no error in the court's admission of the tape.
 
 
 57
 Alvaro's Interpretation of Martin's Recorded Statements
 
 
 58
 Martin argues that the trial court abused its discretion in allowing Alvaro to testify as to his understanding of tape recorded conversations between Alvaro and Martin. Under Federal Rule of Evidence 701, lay witnesses may state their understanding of the use of another person's statements "only if rationally based on the perception of a witness and helpful either to an understanding of the testimony of the witness on the stand or to the determination of a fact in issue." United States v. Cox, 633 F.2d 871, 875 (9th Cir.1980), cert. denied, 454 U.S. 844, 102 S.Ct. 159, 70 L.Ed.2d 130 (1981). Martin's language on the tapes is sharp and abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events that are clear only to Martin and his audience. To the uninitiated listener, Martin speaks as if he were using code. Alvaro's opinions are based upon his direct perception of the event, are not speculative, and are helpful to the determination of Martin's involvement in the protection scheme and the subsequent attempt to silence Ricci with "hush money." Moreover, the trial court vigorously policed the government's examination of Alvaro to ensure that he was not asked to interpret relatively clear statements. Under these circumstances, we find that the court did not abuse its discretion.
 
 Sufficiency of Evidence for Obstruction
 
 59
 Counts Three through Five of the indictment charged James Martin with obstruction of justice. These counts were based upon Martin's payment of money to Ricci on three separate occasions: five hundred dollars on February 17 and March 26, and one thousand dollars on April 8, 1984. On appeal, Martin argues that the evidence presented at trial failed to establish beyond a reasonable doubt that Martin intended these payments to ensure Ricci's silence.
 
 
 60
 Martin contends that the evidence concerning his intent is ambiguous, and that the payments were merely loans advanced to his friend and neighbor, Albert Ricci. Our review of the evidence, viewed in the light favorable to the government, convinces us that the jury could have reasonably found that Martin's payments were intended to prevent Ricci from testifying about Martin's participation in the extortion conspiracy. The record is replete with offers by Martin to arrange to get Ricci a job, to support Ricci while he served time in prison, and to pay for Ricci's legal fees. Martin's admission that he owes Ricci financial support because Ricci is "going to bat for him" and that Ricci could expect this support only if Martin retained his freedom and Ricci kept his "mouth shut" supports the inference that these offers are not solely altruistic.
 
 C. Claims Initially Raised by Linso
 
 61
 Sufficiency of the Evidence to Convict Linso of
 
 
 62
 Participation and Conspiring to Participate in
 
 RICO Enterprise
 
 63
 Linso argues that while the testimony sufficed to show that he received protection payments, he lacked "knowledge about the essential nature of the conspiracy," and the government failed to show his "agreement to participate in the conduct and affairs of the enterprise" or his commission of "an overt act in furtherance of the conspiracy." Linso was the captain of the Fifth District under Inspector DePeri. Alvaro testified that after DePeri originally chastised Linso for "fooling around with the machines," DePeri reconsidered his position and told Linso that "he could do what he wanted with the machines." Ricci testified that he delivered Linso's money directly to him at the Fifth District headquarters "maybe four or five times" and on two occasions had delivered money to Linso after Linso had been transferred from the Northwest Division. Ricci also testified that he and Linso had discussed the names of vendors who could "hurt him if they testified against him" before the grand jury. Donald DeVore, a video poker machine vendor, testified that he met with Linso at the Fifth District headquarters and discussed the number of machines he had in Linso's district, and the size and manner of protection payments for those machines. Viewed in the light most favorable to the government, we believe that the jury could have reasonably found that Linso understood the nature of the larger enterprise he was involved in, agreed to participate in that enterprise, and did indeed participate.
 
 
 64
 The Government's use of a Chart During its Opening Statement
 
 
 65
 Linso maintains that the use of a chart by the government in its opening statement deprived him of his right to a fair trial. He suggests that the chart linked him to the conspiracy before evidence concerning the conspiracy had been introduced. We disagree.
 
 
 66
 The opening statement is not evidence in itself, but serves "to give the jury the broad outlines of the case to enable the jury to comprehend it." Government of the Virgin Islands v. Turner, 409 F.2d 102, 103 (3d Cir.1969). As long as the opening statement avoids references to matters that cannot be proved or would be inadmissible, there can be no error, much less prejudicial error. See Maxworthy v. Horn Electric Service, Inc., 452 F.2d 1141, 1143-44 (4th Cir.1972). To begin, we take notice that such charts are often employed in complex conspiracy cases to provide the jury with an outline of what the government will attempt to prove. The chart complained of in the instant case contained the names of the participants in the protection scheme, including the defendants, the dates they served in the Philadelphia Police Department, and the divisions in which they served. After considering the arguments of the government and the defendants, the court permitted the use of the chart as a demonstrative aid to help the jury remember the names and positions of the defendants. We hold that the court did not abuse its discretion in allowing the government to use a visual aid in its opening statement. The use of a chart to preview the government's case certainly did not "poison the jury's mind" against the defendants, nor did it allude to "items of highly questionable evidence." Turner, 409 F.2d at 103.
 
 
 67
 Admission of Recorded Conversations Against Linso
 
 
 68
 Linso suggests that the trial court abused its discretion by admitting a recording of a telephone call in which Linso and Alvaro discussed the upcoming indictments. Linso argues that the tape should have been excluded on grounds of relevance and prejudice. We disagree. Linso displayed a cavalier attitude during the call, an attitude from which the jury could reasonably infer that Linso had failed to protest his guilt because he was culpable. Given Linso's counsel's insistence at trial that the jury hear the entire conversation, the sufficiency of the evidence apart from this tape to convict Linso, and the trial court's instructions to the jury, after they had listened to the tapes, that references to indictments were not evidence, we find no abuse.
 
 
 69
 Admission of Goldsworthy's Statement Against Linso
 
 
 70
 Linso asserts that the trial court abused its discretion by admitting a statement by John Goldsworthy, a poker machine vendor, that he "understood" that the money he paid to Ricci would be going to "whoever was in that district." We disagree. Federal Rule of Evidence 801(c) defines hearsay as an out-of-court statement "offered in evidence to prove the truth of the matter asserted." We believe that Goldsworthy's statement was not hearsay because it was not offered to prove the truth of the statement, i.e., that the protection money was actually going to all the Fifth District's officers. A more reasonable interpretation is that Goldsworthy testified as to his belief that he was paying protection money to the district rather than just to Ricci. Furthermore, we note that Linso's counsel neglected to pursue his objection and explore the basis for Goldsworthy's understanding on cross-examination. Under these circumstances, we find no abuse.
 
 D. Claims Initially Raised by Morrell
 
 71
 Denial of Severance Motions by Morrell, Murphy, and Katz
 
 
 72
 Morrell contends that his resignation from the Philadelphia Police Department on March 29, 1983 terminated his association with the conspiracy as well. In accordance with department procedure, news of Morrell's resignation was sent over the department's teletype to all precincts. Captain Linso, Morrell's commanding officer and the only person in the conspiracy who knew about Morrell's involvement, testified that he had read the teletyped report of Morrell's retirement. Given these facts, Morrell argues that he had shown that he had withdrawn from the conspiracy as a matter of law and was entitled to a severance from the trial of the other defendants.
 
 
 73
 The legal principles governing withdrawal are relatively clear. In United States v. Continental Group, Inc., 603 F.2d 444, 467 (3d Cir.1979), cert. denied, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980), we observed that " '[m]ere cessation of activity in furtherance of the conspiracy is not sufficient to establish withdrawal'." Once the government establishes by a preponderance of the evidence a defendant's connection with a conspiracy, "[t]he defendant must present evidence of some affirmative act of withdrawal on his part, typically either a full confession to the authorities or communication to his coconspirators that he has abandoned the enterprise and its goals." United States v. Steele, 685 F.2d 793, 803 (3d Cir.) (citations omitted), cert. denied, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); see United States v. United States Gypsum Co., 438 U.S. 422, 464-65, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978). If the defendant makes this prima facie showing, the government must rebut the showing "either by impeaching the defendant's proof or by going forward with evidence of some conduct in furtherance of the conspiracy subsequent to the act of withdrawal." Steele, 685 F.2d at 804. Relying upon Steele, Morrell believes that his retirement notice satisfied this burden and required the government to present further evidence of his continuing involvement in the conspiracy. We disagree.
 
 
 74
 Steele concerned General Electric's attempt to win a construction contract through a bribery scheme. Naples, a General Electric employee, argued that he had withdrawn from the conspiracy by resigning from General Electric. In holding that Naples had made a prima facie case of withdraw, we noted that Naples had presented evidence that he had permanently severed his employment relationship with General Electric. Termination of employment with General Electric in Steele sufficed to notify Naples's coconspirators that he had abandoned the enterprise and, necessarily, its goals and any claim to the conspiracy's benefits. Resignation from the police department in the instant case did not carry the same message. Morrell failed to introduce any evidence to show that this notice affirmatively disassociated him from his contacts in the department or the victims of the extortion scheme, nor did the teletype message communicate that Morrell had repudiated all claim to the conspiracy's benefits. Unlike Steele, the government presented evidence showing that continued employment was not a necessary prerequisite to participation in the conspiracy. Under these circumstances, we hold that Linso's knowledge of Morrell's resignation, by itself, does not constitute the affirmative break with the conspiracy required to establish a prima facie case of withdrawal.
 
 
 75
 Murphy and Katz raise the same issue. Our review of the record leads us to conclude that there is even less support for the proposition that these defendants withdrew from the conspiracy. Murphy resigned on November 11, 1982 and Katz on March 14, 1983. Neither man produced evidence of an act that communicated abandonment of the enterprise and its goals to the other members of the conspiracy other than the resignation itself. With respect to Murphy, there is evidence that he attempted to extort money from a video machine vendor after he resigned from the department. We therefore hold that neither Murphy nor Katz established a prima facie case of withdrawal that might have supported a severance motion.
 
 
 76
 Admission of Coconspirators' Statements Against Morrell,
 
 Murphy and Katz
 
 77
 Morrell, Murphy, and Katz maintain that the district court erred by permitting the admission of certain taped conversations recorded after they had allegedly withdrawn from the conspiracy. They argue that these tapes should not have been admitted against them because the court did not find specificially as to these appellants that the preponderence of the evidence established that they were coconspirators at the time of the recordings.
 
 
 78
 We have held previously that the government must establish by independent evidence the existence of an ongoing conspiracy and the connection of both the hearsay declarant and the defendant against whom the statement is offered to this conspiracy to trigger the coconspirator exception to the hearsay rule, Federal Rule of Evidence 801(d)(2)(E).[4] See United States v. Inadi, 748 F.2d 812, 816-17 (3d Cir.1984), cert. granted, --- U.S. ----, 105 S.Ct. 2653, 86 L.Ed.2d 271 (U.S.1985); United States v. Gibbs, 739 F.2d 838, 843 (3d Cir.1984) (in banc), cert. denied, --- U.S. ----, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985); United States v. Ammar, 714 F.2d 238, 245 (3d Cir.), cert. denied, Stillman v. U.S., 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). Generally, the trial judge makes a finding that the government has shown the conspiracy's existence by a preponderance of the evidence before the statement is admitted. See United States v. Trowery, 542 F.2d 623, 627 (3d Cir.1976) (per curiam), cert. denied, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977). This practice ensures the reliability of the coconspirator's statements by linking the defendant to the conspiracy before the statements are admitted and prevents the government from proving the conspiracy from the coconspirators' statements alone. We recognize, however, that in complex trials involving a large amount of interrelated testimony, it may be necessary to admit the statements provisionally, subject to a later finding of a conspiracy established by the preponderance of independent evidence. See United States v. Continental Group, Inc., 603 F.2d 444, 456-57 (3d Cir.1979), cert. denied, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980).
 
 
 79
 In the instant case, the court exercised its discretion and admitted the recorded conversations subject to a later Trowery conspiracy finding. At the close of the government's case in chief, the trial court made a Trowery finding, prefacing its remarks by discussing the reasons why it could not rule that Morrell, Murphy, and Katz had made a prima facie case for withdrawal from the conspiracy. The court then went on to find that the evidence independent of the taped coconspirators' statements clearly established the existence of a conspiracy involving all of the defendants at the time of the conversations. Although we would have preferred a separate Trowery finding as to these appellants for the purposes of review, because the court made its Trowery finding immediately after dismissing appellants' withdrawal claims, we are compelled to hold that the court had reasonable grounds to find that Morrell, Murphy, and Katz were active participants in the conspiracy at the time of the conversations. See Ammar, 714 F.2d at 250.[5]
 
 
 80
 Coconspirators Statements "Not in Furtherance" of the Conspiracy
 
 
 81
 Alternatively, Morrell, Murphy, and Katz allege that certain portions of the recordings should not have been admitted under the coconspirators exception because the statements were not made "in furtherance of the conspiracy." These conversations, most of them between Alvaro and Martin, concerned the grand jury investigation, the selection of counsel, and the need for character witnesses. We have observed that the "in furtherance" requirement of Rule 801(d)(2)(E) is generally given a broad interpretation. See Gibbs, 739 F.2d at 845. In Ammar we said that statements that "provide reassurance, serve to maintain trust and cohesiveness among [the coconspirators], or inform each other of the current status of the conspiracy further the ends of the conspiracy." Ammar, 714 F.2d at 252. Although the tapes do not concern the central focus of the conspiracy, i.e., the extortion of protection payments, they contain conversations between members of the conspiracy apprising one another of their efforts to avoid indictment and conviction. As such, we hold that these statements were made in furtherance of the conspiracy.
 
 Sixth Amendment Confrontation Right
 
 82
 Morrell and Murphy contend that the admission of certain portions of tape recorded conversations, again mainly between Alvaro and Martin, violated their sixth amendment right to confront witnesses against them. The cases they cite supporting this proposition, however, are inapposite. In United States v. Smith, 578 F.2d 1227 (5th Cir.1978), the court excluded the recorded conversation of a person who was not a member of the conspiracy at the time he made the statements. Id. at 1233. Appellants concede that Martin was a member of the conspiracy at the time of the conversations. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), addressed a situation where a nontestifying co-defendant's confession was introduced into evidence against him at a joint trial, accompanied by the court's cautionary instruction to the jury that they could consider the confession only against the confessing defendant. Despite these instructions, the Supreme Court held that the statement was inadmissible because the confession clearly implicated the nonconfessing co-defendant in the crime. We should first note that the confession in Bruton constituted hearsay evidence against the co-defendant. As we discussed above, the trial court properly admitted these tapes against Morrell and Murphy under the coconspirators' statements exception to the hearsay rule.
 
 
 83
 Although the Supreme Court has indicated that the conconspirators exception is narrower than the sixth amendment requires, see Dutton v. Evans, 400 U.S. 74, 82, 91 S.Ct. 210, 216, 27 L.Ed.2d 213 (1970) (plurality opinion), neither the Supreme Court nor this one has ever equated the two. See Gibbs, 739 F.2d at 852 (Rosenn, J., dissenting); Ammar, 714 F.2d at 255. Our examination of the record shows that appellants did not suffer any prejudice from the introduction of the statements. Indeed, we do not believe that the statements are covered by Bruton at all. Appellants are mentioned only briefly in the conversations when Alvaro and Martin discussed who they thought would be indicted. Nothing in the conversation supports an inference that either Alvaro or Martin knew that Murphy or Morrell were involved in the extortion scheme. Cf. United States v. Ruff, 717 F.2d 855, 856 (3d Cir.1983), cert. denied, 464 U.S. 1051, 104 S.Ct. 733, 79 L.Ed.2d 192 (1984) (admission involving repeated references to defendant and detailing his substantial involvement in the crime charged held Bruton statements). Further, the trial court immediately instructed the jury that the indictment could not be construed as evidence of guilt. Under these circumstances, we hold that the introduction of the tapes did not violate appellants' sixth amendment confrontation right.[6]Trial Court's Refusal to Give Morrell's Instruction
 
 
 84
 Morrell argues that the court erred by refusing to instruct the jury that it could not find Morrell guilty if they found that he acted as "a 'courier' or 'go-fer' for another defendant." In refusing to give the instruction, the court observed that it was confusing and that it incorrectly stated the law. We agree. Section 1962(c) makes liable those persons who are "employed by or associated with" the RICO enterprise. This section draws no distinction between the foot soldier and the general: "the legislative intent was to make RICO violations dependent upon behavior, not status." United States v. Forsythe, 560 F.2d 1127, 1136 (3d Cir.1977). "Thus, the RICO net is woven tightly to trap even the smallest fish, those peripherally involved in the enterprise." United States v. Elliott, 571 F.2d 880, 903 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). It is no abuse of discretion to refuse to give a misleading instruction. See United States v. George, 625 F.2d 1081, 1087 (3d Cir.1980).
 
 E. Claims Initially Raised by Pecic
 Denial of Pecic's Severance Motion
 
 85
 Pecic contends that because the taped conversations did not involve or mention him, and because he was tried with other, more "notorious" defendants, the court abused its discretion in refusing to grant his severance motion.
 
 
 86
 Federal Rule of Criminal Procedure 14 provides in pertinent part:
 
 
 87
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election of separate trials of counts, grant a severance of defendants or provide whatever relief justice requires.
 
 
 88
 Rule 14 places the burden of showing prejudice from the joinder on the defendant. United States v. Lipowitz, 407 F.2d 597, 601 n. 15, cert. denied, 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466 (1969). We will reverse the district court's decision to deny a Rule 14 severance motion only on a showing of abuse of discretion. United States v. Boyd, 595 F.2d 120, 125 (3d Cir.1978); United States v. Somers, 496 F.2d 723 (3d Cir.), cert. denied, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). Pecic thus faces the "heavy burden" of showing the trial judge exceeded the bounds of his discretionary authority. Boyd, 595 F.2d at 125.
 
 
 89
 We cannot say that Pecic meets this burden. "A defendant is not entitled to severance merely because the evidence against a co-defendant is more damaging than against him." United States v. Dansker, 537 F.2d 40, 62 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Our review of the record and our discussion below of Katz's "spillover" claim lead us to conclude that the evidence was cogently presented and that the jury was able to "compartmentalize" the evidence against Pecic. See Dansker, 537 F.2d at 62.
 
 Refusal to Produce Requested Evidence
 
 90
 Pecic asserts that the government's non-production of information in its possession concerning poker machine vendors who did not admit to being extorted violates Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Brady requires that the government provide a defendant with exculpatory, material evidence in its possession prior to the commencement of trial. See generally United States v. Higgs, 713 F.2d 39, 41-42 (3d Cir.1983), cert. denied, 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984). The requested information is neither exculpatory nor material to Pecic's defense, however. Even if we conceded that this evidence were somehow exculpatory, it is not material, as we do not believe that "the suppressed evidence might have affected the outcome of the trial." United States v. Agurs, 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). Evidence that not all vendors were extorted is irrelevant to the charge that defendants conspired to extort and did extort protection payments from certain vendors. Cf. United States v. Harrison, 679 F.2d 942, 948-49 (D.C.Cir.1982) (evidence that certain witnesses had not purchased drugs from defendant did not undercut government's case).
 
 F. Claim Initially Raised by Katz
 
 91
 Spillover of Evidence Introduced Against Co-defendants
 
 
 92
 Katz argues that Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and United States v. Camiel, 689 F.2d 31 (3d Cir.1982), require this court to vacate his sentence. Katz asserts that the alleged variance between the multiple conspiracies charged in the indictment and the single conspiracy proved at trial allowed the government to introduce evidence unrelated to the conspiracy proved. This may be a "classic" spillover theory, see United States v. Schurr, 775 F.2d 549, 556 (3d Cir.1985), but because we find no variance between the RICO conspiracy charged and the one proved at trial, it is irrelevant. The existence of a variance is a prerequisite to our determination that the allegedly improper evidence materially prejudiced Katz's trial. See Schurr, 775 F.2d at 556; Camiel, 689 F.2d at 35.
 
 
 93
 Katz's spillover argument is better understood as alleging prejudicial joinder of defendants, i.e., that the jury was unable to separate the evidence relevant to Katz from the evidence introduced against the other defendants and thus did not render a fair verdict as to Katz. In particular, Katz maintains that the quantity and manner of presentation of the taped conversations admitted against the other defendants might have confused the jury to the extent that the jury transferred guilt from his co-defendants to Katz. Thus, we will analyze Katz's spillover claim as an appeal of the denial of his pre-trial severance motion.
 
 
 94
 As we noted in our discussion of Pecic's severance motion, a defendant is not entitled to severance merely because the government's evidence against his co-defendant is stronger than its evidence against him. Although we are sensitive to the dangers presented by joinder, see, e.g., State ex rel. Whitman v. Fox, 160 W.Va. 633, 634-46, 236 S.E.2d 565, 567-73 (1977), we also believe that good reasons support the general rule that persons charged with conspiracy should be tried together. See United States v. Jackson, 549 F.2d 517, 523 (8th Cir.), cert. denied, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977). Chief among these is the conservation of public resources that would be lost if the same evidence were presented at separate trials and the decreased possibility of prejudice where the evidence against each defendant is strong. See United States v. Lane, 584 F.2d 60, 65 (5th Cir.1978).
 
 
 95
 Federal Rule of Criminal Procedure 14 requires the trial court to balance the public interest considerations in a joint trial against the possibility of prejudice inherent in the joinder of defendants. Our scope of review of the court's denial of a motion for severance is limited: "the district court's denial of such a motion will not be disturbed absent an affirmative showing that the court's ruling resulted in such prejudice to the moving party that it amounted to an abuse of discretion." Dansker, 537 F.2d at 61, citing United States v. De Larosa, 450 F.2d 1057 (3d Cir.1971), cert. denied, 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972). The proper question on appeal is whether the jury could have been reasonably expected to compartmentalize the allegedly prejudicial evidence in light of the quantity and limited admissibility of the evidence. See Dansker, 537 F.2d at 62; United States v. Serubo, 460 F.Supp. 689, 694 (E.D.Pa.1978), vacated on other grounds, 604 F.2d 807 (3d Cir.1979).
 
 
 96
 We do not believe that Katz has met his burden. Our review of the record shows that the evidence was presented in a clear fashion and that the court carefully instructed the jury as to the manner in which the evidence could be considered. Moreover, the record reveals that all counsel, including Katz's, were alert to the possibility of prejudice from the introduction of the tapes, and ensured that the court gave limiting instructions where necessary. Consequently, we believe that Katz's allegation of prejudice through the transference of guilt between defendants here is speculative and as such, meritless. See Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954).
 
 III.
 
 97
 After careful consideration of defendants' arguments and a thorough examination of the record, we are of the opinion that there is no merit to any of the issues raised on this appeal. Accordingly, we will affirm the judgment of the district court.
 
 
 
 *
 Honorable Herbert Stern, United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 The trial of the second group of defendants commenced on November 5, 1984. Three of these defendants were acquitted by the jury; one pled guilty of conspiracy and participation in a RICO enterprise and to a Hobbs Act violation; and the jury returned a guilty verdict against the remaining three. Sentencing is still pending against the remaining defendant who entered a guilty plea
 
 
 [2]
 At the close of the government's case, the court dismissed two counts charging Hobbs Act violations
 
 
 [3]
 As a result of this earlier investigation, DeBenedetto was tried and sentenced to eight years in prison for extortion on August 1, 1983
 
 
 [4]
 More accurately, coconspirators' statements are not "hearsay exceptions" but are excluded from the definition of hearsay as a type of party admission. See United States v. Ammar, 714 F.2d 238, 255 (3d Cir.), cert. denied, 464 U.S. 963, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983)
 
 
 [5]
 We have repeatedly recognized that when the court denies a motion for acquittal on the conspiracy charge, the court's decision to send the case to the jury implies it has made a Trowery finding. See Government of the Virgin Islands v. Dowling, 633 F.2d 660, 665 (3d Cir.1980); United States v. Continental Group, 603 F.2d 444, 457 (3d Cir.1979). The rationale for this rule is that both the denial of an acquittal motion and the admission of coconspirators' statements require the court to find that the government has shown the conspiracy and the defendants' connection to it by a preponderance of the evidence. See Steele, 685 F.2d at 804; Trowery, 542 F.2d at 627. Because the court denied these appellants' withdrawal motions, it would not have been necessary for the court to find explicitly that appellants had participated in the conspiracy after their resignation for the purposes of admitting the challenged coconspirators' statements against them
 
 
 [6]
 The Second Circuit interprets Bruton to hold that cautionary instructions are ineffective against hearsay statements when two conditions exist: (i) the statement by the nontestifying co-defendant is clearly inculpatory as to the defendant against whom it is offered and (ii) the statement is vitally important to the government's case. See United States v. Knuckles, 581 F.2d 305, 313 (2d Cir.), cert. denied, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); United States v. Wingate, 520 F.2d 309, 313 (2d Cir.1975), cert. denied, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976); see also Dutton v. Evans, 400 U.S. 74, 87, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970) (admitting coconspirator's inculpatory statement and distinguishing Bruton because the statement held not to be "crucial" or "devastating."). Under this analysis, the court did not err in admitting the tapes against Morrell or Murphy. The cited portions of the tape do not clearly implicate either Morrell or Murphy in the conspiracy, nor are they even arguably central to the government's case against them